## WILLISTON *vs.* WILLISTON and others.

County courts have jurisdiction of actions for the specific performance of contracts.

As a general rule, to entitle a party to ask the interposition of a court of equity to enforce the specific performance of a contract, the contract must be supported by what courts of equity deem a meritorious consideration.

If the inadequacy of consideration be so great as to render the bargain hard or unconscionable, the court may refuse its aid to enforce the contract, and leave the parties to contest their rights at law.

Where G. W. the owner of premises consisting of a house and about an acre of land situated in the country, not worth over $75, on agreeing to convey the same to his brother C. W., if he would come and live with him, obtained from the latter an undertaking that he would perpetually maintain the division fences between the lot and G. W.'s farm, being three sides of the lot—a promise which was scrupulously fulfilled for more than twenty years—and on the strength of such agreement to convey to him, C. W. had made valuable improvements upon the premises; *Held* that so far from the bargain being hard and unconscionable on the part of C. W. it would be a hard rule that would pronounce the consideration grossly inadequate; and that it would be unconscionable to deprive him not only of the land but of the fruit of his labor, and of the enjoyment of his improvements.

In equity time is not, ordinarily, of the essence of a contract respecting real estate. It may, under certain circumstances, be made, or become so; but the general rule is that if a party has not been guilty of gross neglect; if his delay can be reasonably explained, and is consistent with good faith; and time has not been made material by the agreement of the parties, a court of equity will afford relief notwithstanding the delay.

It is always sufficient for a party to show that his laches has arisen from a reasonable cause, or has been acquiesced in by the other party.

A parol agreement for the conveyance of land will, if partly executed by the party seeking relief, be specifically enforced.

Where a purchaser takes possession of lands, under a parol agreement of the vendor to convey, a court of equity will decree a specific performance; especially if improvements have been made by the vendee, on the faith of the agreement.

It was always competent to prove the loss or destruction of a paper, for the purpose of admitting parol evidence of its contents, by the party himself; and there is no provision of the code that operates to the exclusion of a party from thus testifying.

A plaintiff, in an action against executors, is a competent witness to prove the contents of a lost letter. Section 399 of the code of procedure was intended to provide for the case of personal intercourse, conversations or

communications had personally with the deceased, and is not applicable to testimony resting in papers or documents of any description.

APPEAL from a judgment of the Lewis county court. The action was brought to enforce the specific performance of a contract for the sale of real estate, made by George Williston, the ancestor of the defendants. The county judge found the following facts and conclusions of law, to wit: 1. That in the fall of the year 1837, the plaintiff, Charles Williston, resided with his family at Oswego, in the county of Oswego, and George Williston his brother resided at Turin in the county of Lewis, and was then unmarried, and owned and occupied a large farm in said town of Turin, including the premises described in the complaint in this action. 2. That while said Charles Williston so resided at Oswego, his brother George Williston invited him by letter to remove with his family to Turin, and proposed to him either verbally or by letter, that if he would so remove to Turin, he, the said George Williston, would give him, said Charles Williston, the house and lot described in the complaint, and would convey the same to him. 3. That afterwards and in or about the month of November, 1837, Charles Williston accepted the proposition of said George Williston, and in pursuance and in consideration thereof did remove from Oswego to Turin, and took possession of the house and lot with said George Williston, and went to work for said George. 4. That afterwards and in the year 1838, George Williston built and completed a stone dwelling house on his farm and within about thirty rods of the house and lot described in the complaint, and removed thereto about the month of October, 1838, from which time the plaintiff was in the absolute and exclusive possession of said house and lot. That George Williston occupied said stone house until he died. 5. That an agreement was made by parol by and between the said Geo. Williston and Charles Williston as a part of the consideration for the conveyance of said house and lot to the plaintiff, that the plaintiff should at his own exclusive cost and expense make

and keep up all fences around said premises, and all partition fences between the said one acre of land and the farm of said George Williston. 6. That the value of the said house and lot when the said Charles Williston took possession thereof did not exceed the sum of seventy-five dollars. 7. That after the plaintiff took and had exclusive possession of the premises, and in the years 1839 and 1840, he repaired the old house on the premises, built a cellar, erected an addition to the dwelling house, built a piazza thereto and made other permanent additions and improvements to the buildings on said premises at an expense of $800, and dug and stoned a well at the expense of $25, in 1838 or 1839, and in the fall of 1837 the plaintiff erected a shop on the premises, then worth $100. 8. That afterwards and in the year 1842, Chas. Williston erected a barn on the premises at an expense of one hundred and fifty dollars. 9. That Charles Williston about the year 1840, also built a new board fence in front of said lot, along the highway, and repaired and rebuilt fences on the northeast and south side thereof, fenced off a garden by a picket fence in the southeasterly corner of said lot, all at a cost of $67; set out fruit trees and shade trees on said premises; also repaired, papered and painted the dwelling house, and kept all of said fences and buildings in repair at his own exclusive cost and expense, and that George Williston never did any thing towards keeping said fences in repair. The plaintiff removed the shop before the death of George Williston, having obtained permission of George so to do, and now uses the same on another lot. 10. That Charles Williston, with the full knowledge of George Williston, continued in the full exclusive possession and occupation of all of said premises from the time George removed, in October, 1838, into his stone house as aforesaid, until the death of said George, and was in such possession at the time of the trial of this action, claiming title thereto and without any claim to the contrary from George Williston, who was during his life frequently at the house of the plaintiff. 11. That

from and including the year 1841, the assessors of the town of Turin assessed the said land and premises to the plaintiff, and he has uniformly paid the taxes thereon from and including 1841, up to the present time, and they have not been taxed to George Williston since 1841. 12. That George Williston, in the latter part of the year 1837, and after Charles Williston had removed to Turin and while he lived on the premises in question, declared to Horace Clapp that he would give Charles a deed of the premises and had agreed to do so. 13. That afterwards and at different times George Williston stated to Chauncey Foster that he had given Charles the said house and lot and would give him a deed thereof, and especially about a year before his death he stated to said Foster that he had not given the plaintiff a deed of said premises, but that he would do so, and that in the winter of 1856 he declared in the presence of Helen Pond and Mrs. Collins that he was willing and ready to deed to the plaintiff the premises at any time, and expected to do so. 14. That about a year before his death, which occurred June 19, 1858, George Williston declared to Richard Dickinson, at Turin, that the property in question was the plaintiff's property. 15. That after George Williston removed to his stone house and before his marriage, which occurred on the 24th day of May, 1850, he stated to Albert White that he was ready to give Charles a deed of the premises at any time, and gave as an excuse for not having done so before that time that Charles was embarrassed by some old debts in Canada; and that in or about the year 1851, an agreement was made between Geo. Williston, Charles Williston and Albert White, by which said White was to become surety for Charles Williston on a note to Charles Kent for $500, the money to be advanced to Charles Williston to aid him in going to California, and that said White was to be secured by a lien on the land, the lien to come from George, for so doing. And about the same time, and in relation to the same transaction, George Williston declared to said Charles Kent, that he, George, had or held

in his hands Charles' place, referring to the premises in question, and that he should be thereby made secure for the $500, whether Charles succeeded in California or not. 16. That George Williston at no time during his life, after the month of November, 1837, denied the right of the plaintiff to hold and own the property in question, nor that he was bound to convey the same to the plaintiff. 17. That the premises in question are now worth the sum of $1000 to $1200, and that the value thereof has been increased mainly by the permanent improvements put thereon by the plaintiff at his own expense, on the faith of the promise and agreement of George Williston to convey the same to him, and that nothing remains for the plaintiff to do to entitle him to a deed and conveyance of the said premises under the agreement therefor between him and the said Geo. Williston. 18. That the said George Williston could at any time during his lifetime have conveyed to the plaintiff a good title to said premises, but that no deed thereof was ever executed to the plaintiff by George Williston during his lifetime. 19. That the said George Williston died on the 19th day of June, 1857, leaving Catharine H. Williston his widow and the defendants Horace M. Williston, George G. Williston and Albert A. Williston his only children and heirs at law him surviving, all of whom are infants under twenty-one years of age, without having incumbered or conveyed the said premises. From the above facts the county judge found as conclusions of law, that the plaintiff was the owner of said premises and had been the owner and in possession thereof since the month of October, 1838, and was entitled to a conveyance of the premises described in the complaint from George Williston at the time of his death, and from the defendants as heirs at law of George Williston deceased. Upon these findings the prayer of the plaintiff was granted, and the defendants, by their guardian ad litem, were required to execute and deliver to the plaintiff a sufficient deed conveying all their right or interest in the premises.

*J. M. Muscott,* for the appellants.

*E. A. Brown,* for the respondent.

*By the Court,* BACON, J. I am by no means prepared to say that I should assent to all the conclusions stated by the county judge of Lewis in his findings of fact, in this case. But there is enough in the evidence, if credited, to warrant the judgment for specific performance. From the testimony it is made to appear that in the year 1837 the plaintiff, who was then a resident in Oswego county, was induced to remove to Turin, in Lewis county, upon the invitation of his brother George Williston, to reside with him; that after remaining together some time, the plaintiff working for the said George, the latter removed to another house he had erected on his farm, and the plaintiff remained in the original tenement, upon the agreement that he was to receive a deed of the lot, being about one acre, on condition that he should at his own exclusive cost and expense build and maintain all the division fences upon the premises, and be entitled to all the improvements he should make thereon. The value of these premises, at that time, did not exceed the sum of $75. In pursuance of this agreement, and in full reliance upon its performance, the plaintiff immediately began to make additions to, and improvements upon the premises, which he continued from time to time until he had expended thereon a sum exceeding $1000. He continued to maintain the division fences, paid all the taxes assessed upon the premises, for a series of years, and until after the death of George Williston, and had exclusive and notorious possession, and the apparent ownership for all this period. The rights he claimed were never interfered with by George, but on the contrary he frequently acknowledged the existence of an agreement by which he was bound to convey the premises to the plaintiff down to a period not many months before his death, and averring that the only reason for not executing the conveyance

was certain pecuniary embarrassments of the plaintiff, which would make it imprudent to convey until that impediment was removed. These are the substantial facts of this case, and about which there is really no controversy; and they present a strong case for equitable relief, unless the claim has been forfeited by the unexplained and inexcusable laches of the plaintiff, or there has been some erroneous ruling on the trial.

It is objected, preliminarily, by the defendant, that the county court had no jurisdiction of the subject matter of the action, and could not decree specific performance. It is enough to say that by the 7th subdivision of § 30 of the code, jurisdiction of the subject matter of this action is expressly given, and the court of appeals, in *Doubleday* v. *Heath*, (16 *N. Y. Rep.* 80,) has decided that this, equally with a suit for partition, is one of the "special cases" in regard to which it was competent for the legislature to confer equity powers upon the county court. It is immaterial, I concede, whether the proceeding had been initiated by petition or by summons and complaint in the form of an ordinary action. The objection on the trial was not to the form in which the remedy was sought, but to the remedy itself. This, as we have seen, is not tenable, and the objection was properly overruled.

It is insisted by the defendant's counsel that the promise to convey to the plaintiff was entirely gratuitous, or if not, and any consideration can be spelled out of the transaction, it is grossly inadequate, and equity will not enforce it.

The promise certainly was not gratuitous; and there is nothing in the case to show that the consideration was so grossly inadequate as to induce a court to refuse its aid to the plaintiff. It is true, as a general rule, that to entitle a party to ask interposition of the court, the contract must be supported by what a court of equity deems a meritorious consideration. (*Will. Eq.* 263.) As to the extent to which inadequacy of consideration will induce a court to refuse its aid, the cases are by no means in harmony, and it is difficult

to lay down any definite or recognized rule. The nearest approximation to it is made by Chancellor Kent in the proposition that if the inadequacy of consideration be so great as to render the bargain hard or unconscionable, the court may refuse its aid to enforce the contract, and leave the parties to contest their rights at law. In this case, it must be remembered that the premises were worth not to exceed $75, and that the party agreeing to convey obtained an undertaking, by which the division fences between the land and his farm, which, as I understand the case, surrounded it on three sides, were to be perpetually maintained—an agreement which has been scrupulously fulfilled for more than twenty years. Upon the strength of this promise, the plaintiff has made valuable improvements upon the premises, and having done all, and more than he agreed to do, so far from the bargain being hard and unconscionable on his part, it would be an exceedingly hard rule that would pronounce the consideration grossly inadequate, and it would be quite unconscionable to deprive him of the land not only, but substantially of the fruit of all his labor and the enjoyment of all his improvements thereon.

It is urged with a good deal of earnestness that the lapse of time, and the gross laches of the plaintiff in making his application to the court is an unanswerable objection to giving him relief. This is by no means so formidable a difficulty as the counsel imagines it to be. It is a familiar doctrine of the courts of equity that time is not, ordinarily, of the essence of a contract in regard to real estate. It may, under certain circumstances be made, or become so, but the general rule is that if a party has not been guilty of gross neglect; if his delay can be reasonably explained, and be consistent with good faith; and time has not been made material by the contract of the parties, a court of equity will afford relief. The explanation here is very simple, and is afforded by the very party who was to make the conveyance, and who, while constantly recognizing his obligations almost to the day of his

death, postponed their fulfillment out of consideration for the embarrassed condition of the plaintiff, which made that delay expedient if not necessary. It is always sufficient for a party to show that his laches has arisen from a reasonable cause, or has been acquiesced in by the other party. Here both these grounds of delay are shown very clearly to exist, and abundantly excuse the laches imputed to the plaintiff.

There is another ground on which the relief should be given in this case. It has long been settled that a parol contract for the conveyance of lands will, if partly executed by the party seeking relief be specifically enforced. If one of the contracting parties induces the other party so to act that if the contract be abandoned, he cannot be restored to his former position, the contract must be considered as perfected in equity, and a refusal to complete it, at law, is in the nature of a fraud. (*Will. Eq.* 283.) And therefore where the purchaser takes possession of the lands by virtue of the agreement, with the assent of the vendor, a court of equity will decree a specific performance; and especially if improvements on the premises be made at the expense of the party thus taking possession on the faith of the agreement. That is essentially this case, and it presents in these respects those features which have uniformly appealed successfully to the equitable powers of this court for relief.

It remains to notice one or two exceptions that were taken to the admission of testimony on the trial, in respect to which it is claimed the court erred in its rulings. The plaintiff was inquired of as a witness in regard to the loss of a letter claimed to have been written by the deceased, George Williston, and gave such proof that its loss or destruction was presumed, and this is claimed to have been erroneous. The plaintiff was clearly competent to give evidence on this subject; and whether he established enough to let in the secondary proof of its contents, so far as it was proposed to show the contents, was substantially a question of discretion for the judge on the trial. It was always competent, to

prove the loss or destruction of a paper by the party, and there is no provision of the code that operates to the exclusion of the plaintiff from thus testifying. I think enough was shown to lead to the conclusion that the letter was lost.

Conceding its loss, then was the plaintiff a competent witness to prove the contents of the letter? The objection is that this is a " transaction or communication had personally" with the deceased, and therefore by § 399 of the code, the plaintiff was incompetent to swear upon the subject. I think this is not the species of testimony the section intended to exclude. It was intended to provide for the case of personal intercourse, conversation or communications, and is not applicable to testimony resting in papers and documents of any description. Suppose the letter had not been lost, but had been produced upon the trial. There could not be a question as to its competency. The evidence of its contents, upon the assumption of its loss, is only another mode of producing the paper that it may speak for itself, in the same manner and with the same effect that it would have done had the letter itself been present. If it had been a lost note, contract or conveyance, its competency could not be questioned, and the moment the loss or destruction is proved, the further evidence only produces the paper in the only form in which it is possible to enable it to speak. The evidence the plaintiff gave upon the subject of the contents of the letter, it will be seen, was only slight, and even if erroneous, which I do not think it was, could not possibly injure the defendants, since all the material facts on which the plaintiff founded his claim for relief were supplied by other and competent proof, entirely outside of and independent of the letter, or of any thing testified to in relation to its contents. And in regard to the letter itself, it may further be said that the testimony of Clapp, which was entirely unobjectionable, established all that was necessary to be proved in regard to the fact that such a letter was written, and quite as much of

the contents as was made to appear by the testimony of the plaintiff.

I do not perceive that there is any thing in the other exceptions that requires discussion. Upon the whole case I think the county court arrived at a just conclusion; but the judge erred in allowing costs to the plaintiff. (*See Swartwout* v. *Burr,* 1 *Barb.* 495.) In this respect the judgment must be modified; and thus modified affirmed, without costs of the appeal to either party.

[ONONDAGA GENERAL TERM, June 28, 1864. *Morgan, Bacon* and *Foster,* Justices.]