ROBERT L. BRIGHT *vs.* GEORGE S. JAMES *et al.*

JANUARY 13, 1913.

PRESENT: Dubois, C. J., Johnson, Parkhurst, and Sweetland, JJ.

*(1) Contracts. Specific Performance.*

Where in a contract for the sale of land, no time was fixed for performance, and the delivery of the deed and the payment of the purchase price were to be concurrent acts, and neither party tendered performance on his part and

demanded performance by the other, from the date of the contract, April 25, 1907, until such action was taken by complainant in the spring of 1909, complainant had not forfeited his rights to demand performance of the contract by reason of laches.

(2)   *Contracts.   Specific Performance.*

Where, in a contract for the sale of land, time is not essential and tender of the deed and payment are to be concurrent acts, and neither party has tendered performance and demanded performance by the other, neither party is in default, and the contract remains in force until barred by the statute of limitations or until notice is given requiring performance within a specified time or until the situation of the parties has so greatly changed that specific performance would be inequitable.

BILL IN EQUITY for specific performance.   Heard on appeal of respondents and dismissed.

JOHNSON, J.   This is a suit in equity brought in the Superior Court for the county of Washington for the specific performance of a contract for the sale of certain real estate in said county described in the bill.   It was brought by the vendee, Robert L. Bright, against the vendors, George S. James and Abby F. James, his wife, and against Charles Capwell and John H. Capwell, later purchasers from them of certain land and timber included in the contract sued on.

It is admitted that the contract was duly executed on April 25, 1907, and was as follows, omitting the descriptions of the properties included:

"Received of R. L. Bright, Five Hundred ($500.00) Dollars, which is to be applied to the payment of the purchase price of Eleven Thousand Two Hundred ($11,200.00) Dollars for which sum we have agreed to sell and convey to said Bright or his assigns, with a good and perfect title, the following described tracts and parcels of land." . . .

"We agree also to accept from said Bright or his successors, or assigns, a mortgage on said different tracts of land for one-half of the $11,200.00, if he or they desire it, for three years, bearing interest at five per cent., payable annually, with right to discharge said mortgage

at any time with accrued interest thereon. The balance of the purchase price is to be paid on the closing of the title and the passing the deed to said different lots or parcels of real estate and other property above mentioned.

"Richmond, Rhode Island, April 25, 1907.

Witness as to
both signatures                George S. James    (Seal)
Amos E. Whitford.              Abby F. James      (Seal)."

It is admitted that at this time the vendors did not have full title to all the properties, but undivided interests in some of them were held by near relatives of Mr. James. This was known to the parties when the contract was executed. Mr. James assured the complainant that he could sell these interests because he had contracted to buy them. One of the properties was subject to a small mortgage, which was not paid until that property was sold to the Capwells. There were also other defects in the titles of some of the properties, which neither of the parties learned of until afterwards. Mr. James testified that the complainant told him then that his lawyer would want a week to look up the properties. He also testified that he told the complainant that he, James, would have Judge Lewis draw the deeds when the complainant was ready.

The complainant and Mr. Whitford, who was with him when the contract was signed, both testified that it was then understood that Mr. James would need some time to get the deeds for these other interests and that when he was ready to deliver a deed with good title, he would notify the complainant and give him a reasonable time to pay the balance of the money and take the deed. The Jameses denied this and testified that on the contrary they told him that they were ready then and that he said he would let them know when he was ready, which would be in thirty or sixty days.

About two months after the making of the contract Mr. James met Mr. Whitford driving near Usquepaug.

He testified that Mr. Whitford was alone and that they did not talk about the contract. Mr. Whitford and the complainant, however, both testified that they were together and that they met Mr. James and talked with him about the contract and that he said that he had done nothing about getting deeds of the outstanding interests and was in no hurry for his money, but would let the complainant or Judge Lewis know when he was ready.

Near the end of June, 1907, Mr. James, by his wife, wrote a letter to the complainant. Mrs. James said that in this letter she tried to convey the idea that she and her husband were ready to perform and wanted him to perform. The complainant's recollection was that it was only a letter of inquiry as to when the sale could be completed. He answered by a letter dated June 26th, 1907, which was introduced in evidence, stating that as soon as Judge Lewis could investigate and report upon the respondents' title and furnish proper descriptions, they would be settled with upon proper execution of a deed, provided their title was good and clear.

Judge Lewis, in May or June, 1907, had been employed by the complainant to examine the titles to the properties and began work the latter part of June or early in July. In order to get information to assist him in that work he wrote a letter to Mr. James, dated July 16, 1907, and introduced in evidence, in which he asked for further information about several of the properties, explaining what he wanted it for, and said that if anybody else except Mr. James owned any part of them, he wanted the names and places of residence of every man and woman that was to sign any of the deeds. Judge Lewis testified that he was never employed to draw any deeds, and that his employment was simply to look up and report on the titles to these properties and many others, which he did as rapidly as he could conveniently, consistently with his other duties.

In consequence of this letter Mr. James called upon Judge Lewis and gave him some information about the properties.

He talked about one of them, the Daniel Webster place, of which he had lost the deed, and did not get another and put it on record until about a year after the contract was made.   He testified that he told Judge Lewis that the heirs were ready to sign the deeds and that he would like to have the matter closed up, but Judge Lewis had no recollection of any such statements.

Nothing else occurred in connection with the matter until about October 10th of the same year, when Mr. James, having got from Judge Lewis the complainant's address in New York, had his wife write the complainant a letter, which was duly delivered to him at his New York office.   It was introduced in evidence and was as follows:

"Octo. 10, '07.

MR. BRIGHT,

MY DEAR SIR:

Not having heard from you in so long, I conclude you have given up the lands.   You surely have had time to find your titles.   The time given to get off the lumber on the South Kingston lot is nearly out.   I shall have to begin cutting the lumber at once.

The longest time you ever mentioned was 6 mos., and it has been 6 mos. with great damage to me.

Yours Very Respectfully,

G. S. JAMES."

West Kingston, R. I.

To this letter the complainant replied by a letter introduced in evidence, which was dated October 12th, addressed to Mr. James at West Kingston, R. I., and duly received by him.   In it he acknowledged receipt of the above letter in reference to the "purchase" of the respondents' properties, and continued: "I have been intending to go to Rhode Island, almost every day for more than two weeks, to see you and other parties from whom I made land purchases, and to assure you and them, not only that those

purchases would be carried out to the letter and in perfect good faith, but to arrange with you and them for that purpose."

He then stated that he intended to live up to his agreements like a man, but that there had been several causes of delay in getting the sales closed up. One of these he gave as the inability of Judge Lewis to complete more rapidly his investigation of the titles. The other he gave as the opposition of certain parties. He closed as follows: "I beg to assure you that the purchase from you will be carried out in good faith, and that before many days, as soon as I can hear from Judge Lewis as to your titles and boundaries. I expect to be in Rhode Island some time next week, and, if possible, I will call to see you, or have you meet me somewhere." He did go to Rhode Island a short time afterwards, but said that he was not able to stay long enough to see Mr. James.

After receipt of this letter Mr. James did nothing about repudiating the contract and testified that he continued to intend to perform on his part for about a year, until the time of the sale of the properties to the Capwells. Mr. Whitford testified that six months or more after the date of the contract he saw Mr. James hauling some lumber and that the latter told him he was cutting some from the land sold to the complainant, but would pay him for it. He did nothing else inconsistent with the contract until the next spring, when he moved the sawmill and began to cut off some of the timber.

He did not at any time tender any deed to the complainant or make any offer of performance and did not make any attempt to communicate with him after the letter of October 10, 1907.

Judge Lewis' report came in the form of a letter to the complainant, dated November 5, 1907, with regard to various titles he was looking up, including those of the properties bought from Mr. James. He said that he had practically completed the examination, but needed explana-

tions as to two or three matters in connection with these latter properties; that there were outstanding interests in some of them; that there was no deed on record of the Daniel Webster lot from Daniel Webster to Mr. James; that the title to nearly all the properties appeared to be good, but that he did not have all his notes typewritten yet.

On receipt of this letter, as the complainant testified, he wrote to Mr. James a letter dated November 7, 1907, a copy of which was filed as "Complainant's Exhibit 2." This was addressed to George S. James at West Kingston, R. I.; the postage was prepaid upon it and it was mailed in New York, but Mr. James testified that he never received it. The envelope had on it the complainant's New York address, but it was never returned to him.

In this letter the complainant stated that he had been in Rhode Island the last of October, but had been unable to see Mr. James; that Judge Lewis had just reported to him that he, James, had not yet secured deeds to the outstanding interests and had no deed to the Daniel Webster lot; that hence it was not possible for him to make a good and perfect title as required by the contract. He protested that it was not fair or right for Mr. James to expect or demand that the complainant pay the balance of the purchase money until the Jameses were ready on the spot to make a deed conveying good title to all the properties, or to expect or require him to go to Rhode Island to perfect their titles for them, to pay off mortgages and any purchase money that Mr. James might have agreed to pay for outstanding interests. He told Mr. James to notify him when he had perfected his titles and was ready to close the transaction according to contract and he would meet him in Providence, Wickford or elsewhere for that purpose.

Shortly after sending this letter the complainant went to his home in Chattanooga, Tennessee, to attend the marriage of his daughter, returning in December to New York, where he remained until about February 13, 1908. Then he went back to Tennessee in bad health and remained

there for about a year in such bad health as to be practically unable to attend to any business. During this time Mr. James and Mr. Whitford and Judge Lewis had his address in New York, and mail sent there was promptly forwarded to him. As soon as he was able to get out in April, 1909, he came to Rhode Island and then learned that Mr. James had sold some of the land and timber covered by the contract to the other respondents, the Capwells, who were cutting off the timber. He promptly went to Mr. James and protested against this and insisted upon the validity of the contract.

Notwithstanding this the Jameses made another sale of timber to the Capwells. The Capwells when they made their purchase knew of the complainant's contract and its terms, but were informed by Mr. James that the complainant had forfeited his rights under it by his acts and neglect.

The parties had made no attempt to communicate with each other up to this time, after the last letter passed between them late in the fall of 1907, though each had the other's address.

Shortly after this complainant went with Mr. Whitford and made formal demand of performance from the Jameses and offered to perform on his part upon proper deduction being made for the value of the timber cut off. This Mr. James refused; taking the position that the complainant had by delay forfeited all his rights under the contract. He did not then or at any other time offer to return to the complainant the $500 paid by him on the contract, or any part of it. Both the complainant and Mr. Whitford testified that at this last interview Mr. James said that he proposed to keep the land and money, too, and would not give up either, unless twelve men said he had to. This he denied saying.

The complainant began his suit August 23, 1909.

The complainant testified that he never intended to abandon this contract and that he could always have

carried out his part of it upon reasonable notice, a few days or a week. A part of the time he had the money himself and a part of the time he had not, but he had arrangements made which would have enabled him to pay the balance due on the purchase price.

When Judge Lewis made a complete report to the complainant on the titles he was examining, neither of them was able to state, but he did so some time after the letter from him to the complainant put in evidence. This report and Judge Lewis' evidence at the trial showed that besides the outstanding interests held by relatives of Mr. James, there were certain other defects in the title to some of the properties, and that in particular there was a gap in the chain of title to the Roger Hill Farm, so-called. It does not appear that this defect was ever called to the attention of Mr. James, or that he ever inquired from Judge Lewis or the complainant as to what, if any, defects in his titles they had found.

Long after the making of the contract and in part since the beginning of this suit, Mr. James got deeds to himself of the outstanding interests in the properties covered by the contract and apparently, except for the defect in the title to the Roger Hill Farm and for the timber cut off and sold, he and the other respondents are now in a position to make a good conveyance to the complainant in accordance with the contract and the latter is willing to accept such conveyance as they can give, and to pay the balance of the contract price, less a proper deduction on account of the timber cut off and sold and other damage suffered.

An interlocutory decree was entered January 27, 1911, declaring certain facts to be admitted which are covered by the foregoing statement and stating twenty-four issues of fact.

The cause was heard in the Superior Court upon oral testimony and certain documentary evidence by Mr. Justice Baker. Upon the issues the judge found the facts substantially as follows: "1. Some of the owners of the

outstanding interests made oral agreements with the said George S. James before the making of the contract by said James and his wife with the complainant that they would sell and convey their said interests to said James or to the complainant." . . . "Other owners of such interests had made no agreement, oral or otherwise, to sell and convey, but had expressed their willingness to do so."

2. Upon the question whether it was orally agreed between the complainant and the respondents James, either at the time said contract was made or afterwards, that they would notify the complainant when they had perfected their title to the said properties and give him reasonable notice of the time when they would be ready to perform said contract, deliver the necessary deed or deeds to the complainant or his assigns and receive from him the balance of the purchase money, the judge found that the evidence was so conflicting that it was difficult to decide what the fact was, but he was inclined to the opinion that the answer should be in the negative.

3. That the said respondents were not ready, willing and able to perform and comply with all the terms, provisions and stipulations of said contract in a reasonable time after the execution thereof, and that they did not so inform the complainant and did not offer to perform said contract.

4. That the complainant did not, on or about the first day of June, 1907, go to the said respondent George S. James and explain that his counsel, Nathan B. Lewis, was looking into the titles of the property referred to in said contract and that as soon as this work was completed the complainant would be ready to complete the contract.

5. That the respondent George S. James did not, on or about the 16th day of July, 1907, express to Nathan B. Lewis, attorney for the complainant, the readiness and capacity of himself and wife to perform said contract and did not then and there complain and protest that the complainant was occasioning a delay in the performance of

said contract, which was contrary to the terms thereof.

6. That they had paid the mortgage in November, 1908, at the same time they acquired the interests of Edward K. James and Mary H. James, his wife; that in 1910 they acquired the interests of Susan C. Dawley and Warren Dawley, her husband; that the record title of the Daniel Webster place was perfected apparently in 1908; and that they never fully perfected their title to all the properties.

7. That said respondents have never been ready to comply fully with the terms of said contract.

8. That the failure of said respondents to give the complainant any notice of their readiness and willingness to perform their part of said contract after the time of its execution, other than that given the said Nathan B. Lewis as his counsel, was not due to the fact that the complainant had left for parts unknown without leaving with the respondents any directions as to where to address him.

9 and 10. That Amos E. Whitford, in November, 1907, was not the agent authorized to bind the complainant by any statement alleged to have been made by him to the respondent George S. James, and that it was therefore not important to determine whether or not Whitford made the alleged statements to said James.

11. That the complainant did notify said respondents, at least twice in the summer and fall of 1907, that he expected and intended specifically to perform said contract on his part whenever they were able and ready to perform it on their part.

12. That the complainant, just before the filing of his bill of complaint, did demand of said respondents a specific performance of said contract and advise them that he was ready to perform it fully on his part, although just how long before was not clear.

13. That the said James and wife did then notify him that he had delayed too long and could not legally or equitably hold them on said contract and that they would not perform said contract.

14.   Upon the question whether the said respondents, during the month of June or thereabouts, 1907, wrote a letter to the complainant in which they complained that they had been ready at all times since the execution of said contract to carry it out and that they were being greatly injured by the action of the complainant in neglecting and refusing to carry out his part of said contract; that the properties were depreciating in value by reason of want of proper care and attention; that the taxes were unpaid; that the time for cutting off the wood on the Luke Clarke place would soon expire under the contract with the owners, and that the owners of the outstanding interests in said properties were insisting that the contract be carried out by the complainant without further delay if they were to be longer holden in the matter, as their interests were exposed to injury and loss by the delay in carrying out the contract and by the want of proper attention to the properties, he found in the negative.

15.   That the complainant up to that time had not signified to the said respondents his readiness and capacity to perform said contract.

16.   Upon the question whether the said respondents during or about the month of October, 1907, wrote another letter to the complainant, notifying him that he must carry out the terms of said contract on his part without any further delay; that they, said respondents, still were and at all times since the execution of said contract had been willing, able and of full capacity to carry out said contract, but that if the complainant was not prepared to perform his part of said contract at once, the said respondents must and would consider the obligations of said contract at an end and that they would no longer be bound by the terms of the sale nor recognize any obligations thereunder, and called the attention of the complainant to the condition of said properties and the injuries and risks they were subjected to through lack of proper care and attention and to the further fact that the taxes were still unpaid and that

the wood on some of said properties needed to be cut at once in order to realize its full value, his finding was as follows: "No; but in October, 1907, George S. James wrote a short letter saying that not having heard from complainant so long, they concluded the complainant had given up the lands; that the delay was with great damage to the writer and that he would have to commence cutting lumber at once." This letter is quoted *supra.*

17. That the complainant did not carry out the promises contained in his letter of October 12, 1907, replying to James's letter postmarked October 10, 1907. The judge proceeded further to say: "The evidence shows that Judge Lewis wrote to the complainant under date of November 5, 1907, informing him, among other things, of defects in the titles of some of the James's property and that the Jameses had not acquired the outstanding interests. The complainant testified that thereupon, under date of November 7, 1907, he wrote and sent a letter to George S. James, calling his attention to these existing defects, informing him that he must perfect his title and that if he would let the complainant know when he was ready to close the transaction, he, the complainant, would meet him for that purpose. The complainant offered an alleged carbon copy of said letter in evidence. The respondent James denies that the alleged letter of November 7, 1907, was ever received by him. I am of the opinion that such letter was not received by the Jameses and, as there is no claim of any other communication I am of the opinion that there was no actual communication between the parties respecting the transaction in question within the year after the receipt of complainant's letter October 12, 1907. As it seems to the court that in the existing circumstances it would have been entirely natural for the complainant to write Mr. James after the receipt of Judge Lewis' letter of November 5th, the weight of the testimony justifies the finding that the letter of November 7, 1907, was written and probably sent, although not received."

18. That the respondent George S. James, in violation of the said contract and without the knowledge or consent of the complainant, did continue after said contract was made to cut the standing timber on the Slocum place, so-called, saw it up in the sawmill and shinglemill on said place and dispose of the sawed lumber for his own benefit.

19. That at the time when the timber on the Luke Clarke place, so-called was sold by the said respondents to the other respondents, Charles Capwell and John Capwell, it was not necessary to remove said timber in order to save its value because by the terms of the purchase of said timber by the respondents George S. James and wife from the owners of said Luke Clarke place, a period of two years only was allowed for the cutting and removal of said timber, which period was about to expire at the time when said timber was sold to said respondents Capwell.

20. Upon the issue, "Did the complainant, as soon as he learned of said sale of timber to the respondents Capwell, go to the respondents George S. James and wife, protest against said sale and notify them that he stood ready and willing to perform said contract fully on his part upon a fair and equitable adjustment of said sales and the injury and damage resulting to the complainant therefrom and of any other injury or damage done to the complainant by other violations of said contract by the respondents George S. James and wife?" the judge said: "Speaking generally, yes. The sale of timber was made in November, 1908. The complainant returned from Tennessee in the spring of 1909, and says he heard of this sale of timber on the Luke Clarke lot to John Capwell, and went to Mr. James about it and protested. It appears that this protest was made in May, 1909. He also heard of negotiations for the sale of the Hoxsie lot to the Capwells and protested against such sale before it was made.

21. That the complainant did, in the month of May, 1909, or thereabouts, demand a specific performance of said contract and state that he was ready to pay whatever

balance of the purchase money might be due to said respondents thereunder.

22.   The issue, "Was the complainant ever able to carry out the provisions of said contract and to perform his part of same according to its terms?" was found in the affirmative.

23.   Upon the question whether the complainant ever offered to perform his part of said contract and expressed his willingness to do so previous to a date just before the filing of the bill of complaint, the finding was, "No, except as it is contained in his letter of November 7, 1907."

24.   Upon the issue, "Was the complainant guilty of laches which forfeited his right under said contract?" the judge said: "This raises the important question of laches. The stipulations of the contract as to the carrying out of the purchase and sale are mutual and dependent. That is, the deed is to be delivered upon the payment of the price, no time being named in the contract for doing these things. In such case an actual tender and a demand by one party are necessary to put the other in default and to cut off his right to treat the contract as still subsisting. No such tender and demand appear to have been made by either party. By the contract the Jameses agreed to sell and convey the tracts of land in question to the complainant with a good and perfect title. He was entitled thereunder to have the conveyance by and from them to himself. The testimony shows that the respondents were able, when the contract was made, to discharge the mortgage on one of the parcels, although they did not do so until the fall of 1908. There is no evidence of the expectancy or ability of the respondents James to purchase the outstanding interests in the properties other than by the use of some of the purchase money to be paid by the complainant. The evidence is that they acquired certain of these intersts in November, 1908, when they sold standing lumber to the Capwells, presumably using the purchase money received from the Capwells for that purpose, and that they acquired

other interests as late as 1910, after the bill in this suit was filed. The record title of the Webster place was not perfected for perhaps a year after the making of the contract between the parties to this suit. There appears to be now a record defect in the title of the Jameses to the Roger Hill place. The evidence shows that there have been times since the making of the contract when the complainant was individually unable to put up the remainder of the purchase money, but that he could and can do so by the assistance of others. It is possible that the respondents by giving the complainant a notice of intention to rescind the contract unless it were carried out by a day named, might have in this way rescinded the contract. It is suggested that the complainant was out of the State for a year and a half without leaving an agent here. The respondents had his address in New York and wrote to him in October, 1907, and received an immediate reply. The evidence shows him to have been in New York city until February, 1908, excepting during portions of the months of November and December, 1907. There is no evidence that the respondents ever attempted to communicate with him after their letter of November, 1907. His absence from the State does not seem to afford an adequate excuse for not attempting to give him notice of their intention to rescind the contract, if that was really their purpose. If they intended to rescind, they should have returned the $500 paid down by the complainant as part of the purchase money when the contract was signed. This they never have shown any intention of doing. The complainant's letter to them, whether it was the letter of October 12, 1907, or that of November, 1907, expresses his intention of completing the purchase. The only facts showing abandonment of the contract upon his part are his failure to do anything in furtherance thereof or to communicate in any way with the respondents James from the fall of 1907 until the spring of 1909. He accounts for this delay, so far as he is concerned, by saying that after going to Tennessee in February,

1908, until his return in the spring of 1909, he was ill and unable to attend to business. With the exception of a month, however, he was in New York attending to business until the middle of February, 1908. I think it is fair to infer that for the most of this period of a year and a half, the complainant was not pressing the conclusion of the transaction, but was quite willing to acquiesce in the apparent similar delay of the respondents James. There is no evidence that the complainant acquiesced in the sale of the lumber on the Clark land or on the Hoxsie property so as to charge himself with estoppel, and after being apprised of said transactions he does not seem to have delayed unreasonably in objecting thereto and in filing his bill of complaint.

"The Presiding Justice in his rescript has said that the Capwells 'could not be *bona fide* purchasers without notice of the equities in favor of the complainant. Having notice of the contract they were bound at their peril to determine the existence of equities arising therefrom.' He bases this finding upon their admission in their answer of notice of the contract between the complainant and the respondents James, and excludes the good faith of the Capwells as an issue in the case. The sales to the Capwells, therefore, do not constitute such a change in the relations of the parties or their circumstances as to affect the right of the complainant to have his contract specifically performed.

"In the light of all the evidence, I am of the opinion that complainant was not guilty of such laches as to forfeit his rights under the contract and that, therefore, the answer to issue 24 should be no. Accordingly, I am also of the opinion that he is entitled to have a decree for the specific performance of the contract.

"The defect in the title of the Roger Hill tract is of such a nature that allowance therefor can be made in ascertaining the balance of the consideration due and payable. The case should be sent to a Master in Chancery to have an

account taken to determine the sum that should now be paid by the complainant to entitle him to a conveyance of the property, and perhaps in what proportion to the different respondents."

A decree was entered in accordance with said decision. From this decree the respondents appealed, assigning as reasons of appeal; that the decree is against the law and the facts; that the court erred: In finding that the complainant was not guilty of laches; in finding that the respondent Charles Capwell had notice of the equities of the complainant; in finding the 4th, 5th and 7th issues of facts in the negative; in receiving in evidence the letter of Nathan B. Lewis to the complainant, dated November 5, 1907, and copy of alleged letter dated November 7, 1907, of complainant to George S. James; in finding the 12th issue of fact in the affirmative; in finding that the complainant made a sufficient offer to perform his part of the contract at any time prior to bringing the bill of complaint; and in the findings upon the 18th, 20th and 24th issues of fact.

From our examination of the transcript of the evidence, we are of the opinion that there was no error in the admission of evidence or in any of the findings of fact.

(1)     The decisive question in the case is: Was the complainant guilty of laches which forfeited his rights under the contract? No time was fixed in the contract for performance. The delivery of the deed and the payment of the balance of the purchase price were to be concurrent acts. Neither party tendered performance on his part and demanded performance by the other until such action was taken by the complainant in the spring of 1909. The rule in such cases is stated in 36 Cyc. 730, thus: "Where time is not essential, and the tender of the deed and payment were to be concurrent acts, and neither party has tendered performance and demanded performance by the other, neither party is in default, and the contract remains in force until barred by the statute of limitations, or until notice is given requiring performance within a specified time,

or until the situation of the parties is so greatly changed that specific performance would be inequitable."

(2)    Pomeroy, Contracts and Specific Performance, says, Sec. 361: "Where the stipulations are mutual and dependent—that is, where the deed is to be delivered upon the payment of the price, either on a day named or without any day being specified—an actual tender and demand by one party is absolutely necessary to put the other in default, and to cut off his right to treat the agreement as still subsisting. So long as neither party makes such tender—of the deed by the vendor and of the price or securities by the vendee—neither party is in default; the contract remains in force, and either party may make a proper tender or offer and sue, until barred by the statute of limitations."

The principle is well illustrated in the case of *Bank of Columbia* v. *Hagner*, 1 Pet. (U. S.) 464, 7 L. Ed. 219, where the court says: "In contracts of this description, the undertakings of the respective parties are always considered dependent, unless a contrary intention clearly appears. A different construction would, in many cases, lead to the greatest injustice, and a purchaser might have payment of the consideration-money enforced upon him, and yet be disabled from procuring the property for which he paid it. Although many nice distinctions are to be found in the books upon the question, whether the covenants or promises of the respective parties to the contract, are to be considered independent or dependent; yet it is evident, the inclination of the courts has strongly favored the latter construction, as being obviously the most just. The seller ought not to be compelled to part with his property without receiving the consideration; nor the purchaser to part with his money, without an equivalent in return. Hence, in such cases, if either a vendor or a vendee wish to compel the other to fulfill his contract, he must make his part of the agreement precedent, and cannot proceed against the other, without an actual performance of the agreement, on his part, or a tender and refusal."

In the case of *Peck et al.* v. *Brighton Co.*, 69 Ill. 200, p. 203, the court said: "We think it is a clear proposition that appellants had no power to forfeit the contract, unless they at the time were ready and had the ability to convey according to its terms. How should appellants have shown that they could convey, and were ready so to do? The answer to this is obvious. A deed should have been executed by them and the widow, and tendered to Iglehart, and payment demanded."

In *Leaird* v. *Smith*, 44 N. Y. 618, Leonard, C., p. 624, says: "The contract of the parties names a day when a sum of money is to be paid, amounting, with the sum paid when it was signed, to $500, the whole consideration being $900. On the day when the last payment was to have been made, according to the terms of the contract, the defendant Smith was to deliver her deed for the land on receiving the said payment, and the plaintiff agreed to deliver his bond and mortgage for the residue of the consideration, $400, payable in two years, with half yearly interest, on the delivery of the deed by the defendant Smith, free of incumbrance. On the day named the sum of $100 was paid, and a note for sixty days for the residue of the cash payment was accepted by the defendants, and the time for the exchange of the deed and the bond and mortgage was extended to the following 14th March, when the note became payable. The defendents notified the plaintiff when the note was accepted and the time extended, that the business must be closed when the note became due.

"The plaintiff paid the note at maturity, but neither party insisted upon closing the contract by the final exchange of papers, as provided by the agreement. The provisions of the contract were dependent upon performance by the other, before either could be put in default. A period was fixed when either of them, by the performance of the stipulated condition, could put the other in default. No such step was taken. The contract remained without further performance by either party for five years. The

rights of the parties were not affected by the notice of the defendants that they would insist upon closing the contract at the extended day. They did not do so by a tender of their deed and a demand of the bond and mortgage. This was a condition precedent to the delivery of the mortgage. It is impossible to perceive that either party could complain of the other without first tendering a full performance. Both parties remained passive. The contract was not annulled or abrogated by the omission or neglect to act for the purpose of bringing it to a termination. Slumbering upon their respective rights would terminate the contract only by such an efflux of time as would create a bar by the statute of limitations. Within that period the plaintiff offered to pay up the sum remaining due, and demanded a deed. This was refused, the defendants claiming that the plaintiff had forfeited all right to a deed by his neglect to deliver his bond and mortgage at the appointed time, and that he had no just or legal claim for a repayment of the sums theretofore paid by him. The claim made by the defendants was not as upon a rescission, but for a forfeiture of the contract. The plaintiff had neglected its performance no more than the defendants, and his right of action either to recover damages of the defendant Smith for non-performance, or for a specific performance, after a tender of the mortgage or the money, the two years having expired, was still perfect when the deed was demanded."

Other cases in the same line are: *Marquis of Hertford* v. *Boore*, 5 Ves. 719; *Byers* v. *Denver Circle R. Co.*, 13 Colo. 552; *Mix* v. *Beach*, 46 Ill. 311; *Crabtree* v. *Levings*, 53 Ill. 526, 530; *Johnson* v. *Jackson*, 27 Miss. 498, 501; *Walton* v. *Wilson*, 30 Miss. 576, 580; *Van Campen* v. *Knight*, 63 Barb. 205; *White* v. *Butcher*, 59 N. C. 231; *Knott* v. *Stephens*, 5 Ore. 235; *Irvin* v. *Bleakley*, 67 Pa. St. 24, 28; *Prothro* v. *Smith*, 6 Rich. Eq. 324; *Riley* v. *McNamara*, 83 Tex. 11, 13; *Jordan* v. *Rhodes*, 24 Ga. 478; *Williston* v. *Williston*, 41 Barb. 635.

The respondents' counsel cite many cases, but examination of them discloses no such conflict with the authorities

and cases above cited as to cause us to doubt the soundness of the doctrine therein laid down.

We find no error in the court's application of the law to the facts as found.

The appeal is dismissed, the decree below affirmed and the cause is remanded to the Superior Court for Washington County for further proceedings.

*Gardner, Pirce and Thornley,* for complainant.
*William W. Moss,* of counsel.
*Harry B. Agard, Tillinghast and Collins,* for respondents.
*James C. Collins,* of counsel.