CLYDE L. BARDEN *et al. vs.* FRANK J. SARKIN *et al.*

JULY 16, 1947.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

FLYNN, C. J.   This bill in equity was brought to have a cloud removed from the title of certain real estate belonging to the complainants, Clyde L. Barden and wife, Grace A. Barden.   The alleged cloud consisted of a recorded instrument whereby Lloyd A. Wheeler, one of the complainants, agreed to sell said real estate to the respondents Frank J. Sarkin and Yvonne B. Sarkin, his wife.   After a hearing in the superior court on the amended bill, answer in the nature of a cross bill, replications and evidence, a final decree was entered denying the respondents' prayer for specific performance of the recorded agreement and granting

the relief prayed for in the bill. The cause is before us on the respondents' appeal from that decree.

The testimony as to certain details of the transaction here involved was in irreconcilable conflict, but the following facts are either undisputed or clearly established by the evidence. The realty involved comprised about eight acres of land, with a house and other improvements thereon, situated in the town of Warren in this state and designated as lots numbered 140 and 332 on the tax assessors' plat of that town. The land was formerly owned by Alfred P. Wheeler and wife, Amy R. Wheeler, as tenants in common.

Alfred P. Wheeler died May 6, 1934, leaving a will whereby he devised all his real estate to his wife, Amy R. Wheeler, for and during her life if she did not remarry, and the remainder to such of the children of his blood as were living at the time of his wife's death. She died, intestate, on November 14, 1943, and her undivided half interest in the property descended to six of her brothers, named Cobb.

At the time of her death, Lloyd A. Wheeler, one of the complainants, was the only surviving child of Alfred P. Wheeler by his first wife and he therefore received, under his father's will, an undivided one-half interest in said property. He was then living in Springfield, Massachusetts. On May 15, 1944 he came to Warren and pursuant to a short talk with the respondent, Frank J. Sarkin, entered into the following agreement:

"May 15 1944
Warren R. .

Agreement
of

I Loyd Wheeler agrees to sell House and land Alfred Wheeler estate on Seymour St to Frank J Sarkin and Yvonne B Sarkin for the sum of $2000.00 on finding the result of Title guarantee and trust Co. for the clear title property paid on deposit $50.00 balance to

be paid on the return of Bond from Title guarantee and Trust Co. $1950.00

(signed) Lloyd A. Wheeler

(signed) Frank J. Sarkin

Witness (signed) Yvonne B Sarkin."

At that time both Wheeler and Sarkin believed that the former owned the entire interest in the property. The agreement was dictated by Sarkin, and was typed and witnessed by his wife. It was not recorded by Sarkin in the records of land evidence in the town of Warren until June 28, 1944. No title examination was ordered or made by Sarkin through the company named in the agreement or any other person. He testified that after looking at the will he considered such title examination would be an unnecessary expense. No further attempt was made by him to complete his purchase. He never communicated with Wheeler, although the latter when making the agreement had given his home address to Sarkin.

Shortly before July 1, 1945, Wheeler first learned that he owned only an undivided one-half interest in the property and that he could not convey a clear title to the entire interest as called for by the agreement. He then telephoned to Sarkin, before the latter went to the hospital, that he had found he did not own the entire interest and asked what he, Sarkin, wanted to do; but Sarkin would not speak one way or the other about it and would not see him. He also telephoned Sarkin late in July, after the latter returned from the hospital, but received no definite answer. Sarkin denied receiving any telephone calls but his wife admitted receiving at least one call from Wheeler's wife. The latter testified that two telephone calls had been made to Sarkin and one to his wife. Neither Sarkin nor his wife ever made known to Wheeler that they were willing to take less than the entire interest in the property, or that they intended to insist upon specific performance to the extent of Wheeler's actual interest.

Before July, 1945, Barden did not know Wheeler. Having

become interested in the property, he investigated its ownership and telephoned to Wheeler in Springfield an offer to buy his interest. The latter came to Warren and verified that he owned only an undivided one-half interest. After telephoning this information to Sarkin, as previously stated, he orally agreed to sell his interest to Barden. Subsequently in Springfield Wheeler conveyed his interest to Barden and his wife by deed dated July 6, 1945. Upon the advice of a lawyer, Wheeler then returned the $50 deposit to Sarkin by money order on August 2, 1945. This money order was received and kept by Sarkin without notifying Wheeler or anybody that he still intended to pursue his rights, if any, under the agreement.

Barden meanwhile applied for a mortgage, and from a title examination learned for the first time of the recorded agreement. He then visited Sarkin to request him to release that agreement from the record. Sarkin did not refuse to do so, nor did he tell Barden that he claimed any rights under the recorded agreement, or that he would seek specific performance. In answer to the request to release the agreement on the record, he merely indicated that he would talk it over with some undisclosed person.

As a consequence of that talk Barden later completed the purchase of the other one-half interest owned by the six Cobb brothers. During all this time the respondents had taken no steps to communicate with Wheeler, or to seek specific performance, or to return the deposit, or to express to him or anybody a willingness to accept whatever interest Wheeler actually owned in lieu of the entire interest in the property as called for in the agreement.

Finally the present bill was brought by Barden, his wife and Wheeler to remove this cloud upon the title. The respondents' answer in the nature of a cross bill was not filed until February, 1946, and even then contained no indication that they were ready, willing and able to take the undivided half interest of Wheeler, subject to his wife's dower, for the purchase price of $2000 stated in the

agreement. The respondents prayed for specific performance of all that agreement. Later an amendment in general terms was added, but it was not until Sarkin testified at the hearing on the merits that he made known the respondents' alleged position that they were ready and willing to perform the agreement on the basis of what Wheeler actually owned.

The trial justice, among other things, found in substance and effect that both Wheeler and Sarkin apparently believed that Wheeler owned all the property at the time the agreement was made; that the reasonable and natural meaning of that agreement was that Wheeler agreed to convey and Sarkin to purchase the entire interest subject to an examination by a named title company showing that Wheeler had a clear title thereto; that Wheeler had waited a reasonable time for some word or action on Sarkin's part to conclude the transaction before it became known that he did not own the entire interest; that he had been given no reason before or after receiving that information to believe that Sarkin would accept less than the whole interest in the property as had been agreed. He further found in effect that the conduct of the respondents, when considered with the other evidence and circumstances, gave rise to circumstances which made it inequitable, in the exercise of sound judicial discretion, to grant specific performance as prayed for by the respondents' answer in the nature of a cross bill.

The respondents contend that the final decree is against the law, the evidence, and the weight thereof. They argue chiefly that they are not guilty of laches so as to bar their rights to specific performance; that Wheeler could not repudiate the agreement and put them in default without tender or offer of performance on his part; that they were entitled to waive the defect in title and seek specific performance; that they are not precluded from relief if Wheeler did not know of Sarkin's election to accept a defective title before suit or by retaining the money order representing the returned deposit; that the trial justice

overlooked or misconceived material evidence; and that the trial court did not exercise sound judicial discretion in refusing to order specific performance.

In our opinion none of these contentions should be upheld. The trial justice did not base his opinion solely upon the respondents' laches. He was entitled, however, to consider their conduct and unreasonable delay as a material element in connection with the other evidence in determining whether, in the exercise of his sound judicial discretion, specific performance should be granted. We are of the opinion that the trial justice did not misconceive or misapply the law in this respect.

The nature of the agreement was such that in the circumstances Wheeler was not required to make a tender or offer of performance. The respondents and not the complainants were asking for specific performance of that agreement. In the agreement no time was fixed for completing the sale and hence a reasonable time therefor is presumed. If such an agreement is open to different constructions, it will be construed against the party drawing it. *Gilman* v. *Murphy,* 67 R. I. 149. It was drawn by the respondents who made a title examination and Wheeler's clear title to the entire interest in the property a prior condition to its performance. Unless that condition were satisfied, the mutual basis on which the agreement was entered would no longer exist. The duty under the contract, confirmed by its terms and common practice, called for respondents to arrange reasonably for a title search to satisfy the condition so that the transaction could be closed. None was made or intended by Sarkin after his investigation of Alfred Wheeler's will, according to his testimony.

When Wheeler's actual interest became known to himself and Sarkin, the latter did nothing further to seek specific performance in whole or in part; but his conduct thereafter was consistent with a waiver or abandonment of his rights, if any, under the contract. This was

further confirmed by the retention of the money order representing the return of his deposit, and also by his conduct thereafter with both Wheeler and Barden. The question appears not so much to be one of waiving a defect in title or an election, as respondents argue, as it is of having no longer a mutually enforceable agreement, or, if there were such a valid agreement, of having by their conduct created circumstances that were consistent with waiver or abandonment thereof and that made it inequitable to grant specific performance.

The case is not at all like *Bright* v. *James,* 35 R. I. 128. In that case there was no conditional contract drawn by the party seeking affirmative relief; nor was there a failure to make arrangements for a title examination as called for by the contract. Moreover the parties seeking specific performance did not wait until they were sued before making their claim. The delays there involved were caused by efforts to investigate and clear the title, not by refusal or failure to perform the duty under the agreement to search the title. In the instant case the facts are obviously different. Other cases have been cited but need not be discussed because they are distinguishable on the facts or are not in point.

Respondents also contend that they were legally entitled to waive the defect in title and seek specific performance. We do not doubt the law as thus stated if applied in a proper case; but the evidence in the instant case warranted the trial justice in finding inferentially that respondents had led Wheeler and Barden to believe that they had abandoned whatever rights they may have had under the contract and by their conduct had created circumstances that in the exercise of the trial justice's sound discretion make it inequitable to grant specific performance. We do not find that the trial justice in making his decision overlooked any material evidence, or that he misconceived the law concerning specific performance as cited by the respond-

ents from *Ball* v. *Milliken,* 31 R. I. 36; *Smart* v. *Boston Wire Stitcher Co.,* 50 R. I. 409. 58 C.J. 859, §14.

In our opinion the circumstances in the evidence bring the respondents under the law stated in 5 Pomeroy Equity Juris. (2d ed.) 4989, §2236, where the author speaking of specific performance says: "the conduct or delay of the plaintiff must not indicate an intention to abandon the contract .... Where the delay of the vendor or vendee in seeking performance is for a speculative purpose, to await until time shall determine whether or not it is to his advantage to have the benefit of the contract, it is held by a considerable group of cases that equity will not aid him by any relief against his failure to perform, whatever the situation otherwise." See also *Miller* v. *Bronson,* 26 R. I. 62, 63.

The respondents' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

Moss, J., did not participate in the decision.

*William H. McSoley, William H. McSoley, Jr.,* for complainants.

*Kirshenbaum & Kirshenbaum,* for respondents.